IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL DWIGHT ROLLINS,<br><br>Defendant. | ORDER & MEMORANDUM DECISION<br><br>Case No. 2:04CR747 TC |

The Federal Grand Jury for the District of Utah has charged Daniel Dwight Rollins with knowing possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and knowing possession of a firearm by an unlawful user of controlled substances under 18 U.S.C. § 922(g)(3). Mr. Rollins has moved to suppress all evidence obtained as a result of a search incident to his arrest on July 29, 2004. Mr. Rollins argues that the search violated his Fourth Amendment rights because it was not conducted contemporaneously with his arrest and also not within a close enough proximity to be considered a valid search incident to a lawful arrest. An evidentiary hearing was held on May 12, 2005.

For the reasons set forth below, Defendant's motion to suppress is DENIED.

**<u>Findings of Fact</u>**[1]

Travis Craven and Heather White rented two rooms at the Extended Stay America in West Valley City, Utah, on July 28, 2004. The registration sheet for room 329 indicates that the room was registered to Mr. Craven and that Ms. White would be an additional guest in that room. The registration form for room 333 states that the room was registered to Ms. White and refers to the information provided on the registration card for room 329. (Mr. Craven testified at the May 12, 2005 evidentiary hearing; Ms. White did not.)

Mr. Craven testified that he and Ms. White had rented one room for themselves and another for Mr. Rollins. He testified: "me and Mr. Rollins had been hanging out together a lot, and I called and asked him if he wanted a room before I actually paid for the whole room. And he . . . said that he did. He said that he wanted the room." (Transcript of the May 12, 2005 Evidentiary Hearing ("Tr.") at 9). Mr. Craven paid $49.00 plus tax for each room for two nights and said that Mr. Rollins "paid us for the room. We got the room ahead of time and him and his girlfriend come up and we rented the room and he paid me for the room." (Tr. at 6-7).

When asked if Mr. Rollins and his girlfriend had spent the night at the hotel in room 329, Mr. Craven answered: "As far as I'm aware of. I couldn't say. I seen them throughout the night at different times. I'd seen him, so my answer would be yes." (<u>Id.</u> at 8). Mr. Rollins never formally registered with the hotel. By stipulation the government offered the testimony of the hotel manager Shawnn Hartley. The stipulation reads: "if management became aware of this sublet type of arrangement, that they would take action to evict or throw out the persons who were subletting the room." (<u>Id.</u> at 10).

On the evening of July 29, 2004, Detective Michael Lynes of the West Valley Police

---

[1] Unless otherwise noted, all facts are taken from the May 12, 2005 Evidentiary Hearing.

Department's Neighborhood Narcotics Unit stopped by the hotel. (Detective Lynes and Detective Aaron Cheshire testified at the May 12, 2005 evidentiary hearing.) The desk clerk told Detective Lynes that: "there was a couple of rooms where there was a lot of people coming and going from, receiving phone calls, and the clerk was kind of concerned with what might be going on in the room." (Id. at 13-14). The clerk identified the rooms as numbers 329 and 333. Detective Lynes examined the registration cards for those two rooms and learned that Mr. Craven and Ms. White were the registered guests.

Detective Lynes testified: "I took the names [of Mr. Craven and Ms. White] out to my car and in my in-car computer . . . ran them through the state of Utah system that we have. I checked them for wants, warrants, and criminal history." (Id. at 14). The computer search revealed that Mr. Craven had an active state felony warrant for forgery. Detective Lynes called for back-up officers to assist in execution of the warrant. Detectives Lynes and Carmen went to room 333 and Detectives Cheshire, Stokes, and Ward, went to room 329.

Detective Cheshire knocked on room 329. A woman's voice answered and Detective Cheshire identified himself as a police officer. Shortly thereafter, a man's voice from inside the room asked what Detective Cheshire wanted. Detective Cheshire answered that he was there to serve a warrant on Mr. Craven. The voice from within the room told Detective Cheshire that Mr. Craven was in room 333 and that Mr. Craven had rented this room for them. Defendant Daniel Rollins eventually opened the door to room 329. Believing that Mr. Rollins might be Mr. Craven, Detectives Cheshire, Stokes, and Ward entered the room.

Photographs of the room indicate that upon entry to the room there is a kitchenette to the left and a door to the bathroom on the right. (Exs. A & B to the May 12, 2005 Evidentiary Hearing). When a person leaves the bathroom, she or he passes into the kitchenette. The

kitchenette is separated from the sleeping area by a cooking island.

Once inside room 329, Detective Cheshire noticed a woman in the room and then tried to open the bathroom door, but found that it was locked. When Detective Cheshire demanded that the occupant of the bathroom come out a man, later identified as J.D. Stevens, came out of the bathroom into the kitchenette area. The other officers escorted Mr. Stevens into the sleeping area of the room. Detective Cheshire began talking with Mr. Rollins in the kitchenette near the door to room 329.

Detective Cheshire testified that Mr. Rollins was "very compliant" and "calm" and did not move unless directed to do so. (Tr. at 73-74). When asked for identification, Mr. Rollins said that he didn't have it with him, but gave Detective Cheshire a name and date of birth. Detective Cheshire testified: "I checked with dispatch to see if there was in fact a driver's license identification card or any warrants out under that name. And I was advised that there was no identification under that name." (Id. at 60). Detective Cheshire continued: "I confronted him with that information . . . , at which point he provided me with a different name. And this went on for probably approximately 45 minutes to an hour." (Id. at 60-61). Mr. Rollins provided Detective Cheshire with five different names before revealing his true identity.

Detective Cheshire testified that after Mr. Rollins had provided him with more than one name: "although [Mr. Rollins] was not in handcuffs, he was clearly under arrest for false information." (Id. at 62). This occurred within ten minutes of the officers' entry into the room. At some point, while still attempting to determine Mr. Rollins' true identity, Detective Cheshire moved Mr. Rollins into the sleeping area and sat him on the bed. After moving Mr. Rollins to the bed, and approximately twenty-five to thirty minutes after Detective Cheshire's initial determination that Mr. Rollins had provided false information, Detective Cheshire placed Mr.

Rollins in handcuffs. After spending ten minutes in handcuffs, Mr. Rollins told the officers his true name. It appears that Mr. Rollins revealed his actual identity approximately forty-five minutes after the initial encounter.

A computer check revealed several outstanding warrants for Mr. Rollins' arrest. Mr. Rollins was then "re-arrested" or "arrested again" but continued sitting on the bed. (Id. at 87-88). Another officer discovered that Mr. Stevens, the other male occupant of the room, also had outstanding warrants. Mr. Stevens was also arrested and seated in a chair to the side of the bed. Detective Lynes then searched the bed and the area around where Mr. Rollins was seated and found a closed red backpack that contained a firearm. Detective Lynes testified that he searched the area surrounding the bed because: "It was the area that I observed [Mr. Rollins and Mr. Stevens] in when I determined they were under arrest." (Id. at 46). Detective Cheshire estimated that Mr. Rollins was seated approximately two feet away from where Detective Lynes discovered the gun.

It is not disputed that Mr. Rollins was compliant and calm throughout the police encounter and did nothing to make the officers feel uncomfortable or concerned for their personal safety. Detective Lynes testified that there was nothing that happened after entry into room 329 that would have prevented the officers from obtaining a search warrant.

## Conclusions of Law

Mr. Rollins has challenged the search of his hotel room during which the officers discovered a firearm which is the subject of this prosecution. Mr. Rollins argues that the search was not sufficiently contemporaneous with his arrest or sufficiently close in physical proximity to be considered a valid search incident to lawful arrest.

Standing

The government has asserted that Mr. Rollins, as an unregistered occupant of room 329 does not have standing to challenge the search. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 131 n. 1 (1978). Standing is determined through application of a two-part test: "(1) whether [the defendant] demonstrated by his conduct a subjective expectation of privacy, and (2) whether society is prepared to recognize that expectation as reasonable." United States v. Conway, 73 F.3d 975, 979 (10th Cir. 1995).

The government argues that Mr. Rollins could not have a subjective expectation of privacy when he was an unregistered occupant of the hotel when "it is questionable whether [Mr. Rollins] actually expected to be allowed to remain in the room once discovered." Id. The court disagrees. Travis Craven testified that Mr. Rollins was the occupant of the room and had paid him $103.00 for two nights in the hotel. There is nothing in the record to indicate that Mr. Rollins knew of the hotel's policy banning unregistered guests. It appears that in Mr. Rollins' mind he was the rightful occupant of room 329 and had no reason to believe that he was violating hotel policy.

Next, the government argues that society is not prepared to recognize Mr. Rollins' expectation of privacy as an unregistered occupant of a hotel room. See Minnesota v. Olson, 495 U.S. 91, 95-96 (1990). The government asserts that by not registering as a guest with the hotel, Mr. Rollins violated hotel policy and accordingly does not possess standing to challenge the search of his room despite the exercise of control over that property. See United States v. Deninno, 29 F.3d 572, 575-76 (10th Cir. 1994) (finding that the defendant did not have standing

to challenge the search of a motel room because he was not the registered occupant of the room); United States v. Dorais, 241 F.3d 1124 (9th Cir. 1986) (held that society would not recognize an expectation of privacy as reasonable where a registered hotel guest violated the hotel's check-out policy).

The Tenth Circuit has held that "an overnight guest in a hotel room or in the home of a friend has a legitimate expectation of privacy in the premises." United States v. Carr, 939 F.2d 1442, 1446 (10th Cir. 1991) (citing Minnesota v. Olson 495 U.S. 91, 95-96 (1990)); see also United States v. Gordon, 168 F.3d 1222, 1226 (10th Cir. 1999). "The pivotal question . . . is whether [the defendant] presented sufficient evidence to show that he was an invited guest of the registered occupant of the motel room." Conway, 73 F.3d at 979; see also Carr, 939 F.2d at 1446 (an occupant of a motel room did not have a reasonable expectation of privacy where he presented no evidence that he was the invited guest of the registered occupant); Minnesota v. Carter, 525 U.S. 83, 90 (1998) ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

In United States v. Gordon, while the defendant was not the registered occupant of the hotel room, he argued that because "he had a key to the motel room, paid for the room, and men's clothing and toiletries were found in the room" he had a reasonable expectation of privacy in the hotel room. Gordon, 168 F.3d at 1226. The court found that the defendant did not have standing because could not "establish that he was the occupant of the room or that he was staying there as [the registered occupant's] guest." Id. at 1227.[2]

---

[2] In Gordon, The court noted that the payment could have been for a variety of different purposes (e.g., payment of a debt or a loan) and also that he had never claimed that the key found in his pocket was his room key. The defendant had told an officer that he had "only taken the key from the room so he could enter the motel room after meeting with someone in the parking lot" Gordon, 168 F.3d at 1226-27.

Here, Mr. Craven's testimony establishes that Mr. Rollins did stay in the room, that he was invited to do so by Mr. Craven who was the registered occupant of the room, and also that the payment made by Mr. Rollins to Mr. Craven was for rental of the hotel room.  Under Conway, Mr. Rollins must at least demonstrate that he was the invited guest of the renter of the premises.  Conway, 73 F.3d at 979.   He has presented sufficient evidence to show that he was, in fact, the invited overnight guest of Mr. Craven and therefore has standing to challenge the search.

### Search Incident to Arrest

Mr. Rollins argues that the search of the area surrounding the bed was not conducted contemporaneously with his arrest or generally confined to the immediate vicinity of his arrest and thereby violated his Fourth Amendment rights .  See United States v. Pollack, 895 F.2d 686, 693 (10th Cir. 1990).

"Generally, a limited, warrantless search of a motel room incident to the lawful arrest of its occupants is permissible."  United States v. Burns, 624 F.2d 95, 101 (10th Cir. 1980) (citing United States v. Pollard, 466 F.2d 1, 4 (10th Cir. 1972)).  "[A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the area immediately surrounding the arrestee."  United States v. Marquez, 687 F.2d 328, 330 (10th Cir. 1982); see also Knowles v. Iowa, 525 U.S. 113 (1998);  New York v. Belton, 453 U.S. 454, 457 (1981); Edwards, 242 F.3d at 937.  In order to determine whether the officers' search was a proper search incident to lawful arrest, the court must first determine at what point Mr. Rollins was actually arrested.

There is no question that Mr. Rollins was seized and not free to leave upon Detective

Cheshire's entrance into the hotel room and there is apparently no question as to the constitutional validity of this seizure.  The question is whether Detective Cheshire's unspoken determination that Mr. Rollins was under arrest constituted a custodial arrest that triggered the search incident to lawful arrest or was merely an investigatory detention under Terry v. Ohio, 392 U.S. 1 (1968).

Before the Supreme Court's decision in Terry v. Ohio, all Fourth Amendment seizures were analyzed as arrests.  United States v. Madrid, 30 F.3d 1269, 1277 (10th Cir. 1994); see also Dunaway v. New York, 442 U.S. 200, 208-09 (1979); Wayne R. LaFave, Search and Seizure, § 5.1(a), at 9 (3d ed. 1996).  After Terry it is clear that certain detentions constitute "seizures" under the Fourth Amendment, but are limited in scope and not considered "arrests."  See Dunaway, 442 U.S. at 208-09.  The Supreme Court has noted that there is no "litmus-paper test" to determine whether a seizure exceeds an investigatory stop and thereby amounts to a de facto arrest.  Florida v. Royer, 460 U.S. 491, 506 (1983).  The Tenth Circuit has written that "if police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent."  United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994).

It is often said that a de facto arrest has occurred "when 'a reasonable man in the suspect's position would have understood his situation,' . . . , to be tantamount to being under arrest.  United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  "The determination of whether an individual is detained pursuant to a valid investigatory stop or is actually under arrest must be based upon the facts of the case." United States v. Muldrow, 19 F.3d 1332 (10th Cir. 1994);  United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998); Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).  Courts

generally look at the intrusiveness of the encounter and the traditional indicia of arrest to determine whether an encounter constitutes an arrest or whether it is a less intrusive detention under Terry v. Ohio. See Melendez-Garcia, 28 F.3d at 1051-52; Washington, 98 F.3d at 1185.

The use of handcuffs and display of firearms by police officers is considered a traditional indicia of arrest, but is not determinative of whether an individual is under arrest. See Melendez-Garcia, 28 F.3d at 1052 (finding that the use of handcuffs and firearms exceeded scope of Terry stop); United States v. Glenna, 878 F.2d 967, 972 (7th Cir.) ("handcuffs are restraints on movement normally associated with arrest."(emphasis in original)); Acosta-Colon, 157 F.3d at 18 ("There is no question that the use of handcuffs, being one of the most recognizable indicia of a traditional arrest, 'substantially aggravates the intrusiveness' of a putative Terry stop." (Citations omitted)); but see United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993) (display of firearms and use of handcuffs reasonable during Terry stop).  The First Circuit, examining whether an encounter constituted a de facto arrest, wrote:

> Although . . . the two men raised their hands when asked to face the wall for the frisk, this form of compliance with the officer's instructions does not make the interaction tantamount to arrest.  The officers did not display weapons, use handcuffs, or exert any physical force on the two men.  Directing them to move a few steps from the hallway to the kitchen, presumably a larger space and thus a more natural setting for conversation, in all likelihood defused some of the tension . . . ; it certainly was not a dramatic change in the officer-suspect relationship that converted a Terry stop into an arrest.

United States v. Campa, 234 F.3d 733, 738-39 (1st Cir. 2000).

In the present case, Detective Cheshire entered the hotel room and shortly thereafter determined that Mr. Rollins had provided false information.  Detective Cheshire then decided to arrest Mr. Rollins, but did nothing to effectuate this arrest and continued to question Mr. Rollins about his identity.  It was not until several minutes later, after he had been escorted to the

10

bedroom and seated on the bed, that Mr. Rollins was handcuffed and told that he was under arrest. Nothing in the encounter before Mr. Rollins was placed in handcuffs would have communicated to a reasonable person that he was under arrest or indicated that the encounter had transformed from an investigatory detention to an arrest. There was no use of force or any other indicia of arrest. Therefore, the court finds that the search incident to lawful custodial arrest occurred when Mr. Rollins was put in handcuffs and told he was under arrest.

The area over which the person arrested has immediate control at the time of arrest may be searched contemporaneously with the arrest. Chimel v. California, 395 U.S. 752, 781 n.15 (1969).

> Because searches incident to arrest are meant to discover hidden weapons and to prevent the suspect from destroying evidence, a search incident to arrest may extend only to the area within the suspect's "immediate control," as that is the only area from which the suspect could draw a weapon or damage evidence.

United States v. Edwards, 242 F.3d 928, 937 (10th Cir. 2001) (citations omitted). In this case, the search was conducted within ten to fifteen minutes of the custodial arrest and was therefore sufficiently contemporaneous. The search also took place within a few feet of where Mr. Rollins was seated at the time arrest and was therefore conducted in Mr. Rollins' immediate vicinity.[3]

Mr. Rollins relies on United States v. Bonitz, 826 F.2d 954 (10th Cir. 1987), to argue that the search in this case "was not conducted in order to disarm defendant or to protect the safety of the officers" and that "no serious claim has been made that the destruction of evidence was feared." Bonitz, 826 F.2d at 956. The court notes, however, that: "Every arrest must be presumed to present a risk of danger to the arresting officer. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of potential danger."

---

[3] The court notes that even if Mr. Rollins was formally arrested in the doorway to the hotel room the arrest would have justified a search of the entire motel room. United States v. Burns, 624 F.2d at 101.

Washington v. Chrisman, 455 U.S. 1, 7 (1982) (citations omitted); Marquez, 687 F.2d at 330. Regardless of Detective Cheshire's perception that there was no danger, the officers were justified in conducting a search for weapons upon the custodial arrest of Mr. Rollins.

### ORDER

Accordingly, Mr. Rollins' motion to suppress is DENIED.

DATED this 18th day of July, 2005

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge